Okay, our next case we're ready to hear from counsel. May it please the court. Henry Willett with Christian Barton on behalf of the appellants in this matter, Jeremiah Winters, Kate Atwood, Jennifer Thompson, Abby Sorensen, and Founders Grove Wealth Partners, LLC. With me today is my counsel, Liz Alcott. We're here today because of the district court's order granting the appellee's motion for preliminary injunction. Ordering that our clients are prohibited from disclosing or using plaintiff's trade secrets or proprietary information and from soliciting or attempting to solicit any of their clients. Now, briefly... Those aren't the full parameters, right? The court said you can still service your existing clients with trade secrets, any clients who leave of their own volition, you can service with trade secrets. I mean, it was pretty narrow, right? Just that you can't use it to solicit more of plaintiff's clients until, you know, for the time being. That is correct, Judge. That is absolutely correct. It seemed pretty nuanced to me. It is, but here's the importance of why that order impacts my clients and why we're here today. Because my clients who... I do have to distinguish between Mr. Atwood and Mr. Winters from Sorensen and Thompson because Atwood and Winters are investment advisor representatives. And as you've seen in the pleadings, we argue that they are subject to something called the protocol for broker recruiting. Before you get to the protocol, I just want to make sure I understand the issue because it seems like that's where you're mostly focused. You're not arguing that the non-solicitation confidentiality obligations are unenforceable or are too broad or don't cover what you're doing on the contractual sort of thing. If we didn't have the protocol, you're not arguing that what you're doing isn't violating the agreement. There's... We're kind of on... The agreement is what it is. The conduct is what it is. It would stop you unless the protocol permits you to do what you're doing. Yeah, let me answer that in two parts, Judge. So first of all, we have... You are correct. Today, for purposes of the responding to their motion for temporary restraining order and preliminary injunction, we are relying on the protocol and the fact that they follow the protocol. We have, in answering their complaint, stated that we do believe that the non-solicitation provision is overly broad and unenforceable. But that's not an issue that was... That's not a defense to the request for an injunction. We are here simply on the protocol. We believe the protocol applies. They followed the protocol and they should not be enjoined. Further clarification, question along the lines of Judge Quattrobon, just like because it's been a long time since I've taken agency and things, but like there could be an argument that to the extent the employment contract forbids this, that violates some other external source of law, like it unfairly restrains trade and violation of state law. There's no sort of argument like that in this case right now, right? For purposes of the injunction, that is correct. That is correct. We are here simply on the protocol. And one other kind of table setting issue. I don't see in the appellate briefs there's an argument that the injunction applies to the new entity that was created and it shouldn't because the new entity was not a party to the agreements. Yeah, well, I believe that we can... I can pull the order, Judge, but the way that Judge Hudson's order reads is it does apply to defendants. Right. Typically, well, I'm at... I mean, the defendants include the entity, correct? Defendants include the entity. Okay. And my point is there might or might not be an argument. In this case, it may not make much of a difference, but there might or might not be an argument that it would be improper to have an injunction as to the entity based on an agreement that some individuals signed. If the entity had, you know, if the entity was a pre-existing entity, that might matter. Maybe here it mattered. But my only point is that's not part of what we're talking... You haven't advanced that argument, right? I don't... I don't think the court needs to address that separately because fundamentally we don't get to that point if the court... if the protocol applies and our... and the court finds, ultimately, the district court finds... No, I think this is sort of the flip side of what you just said. I agree. Your view is it's not valid as to anybody. But what I don't see you having preserved in your appellate brief is an argument that even if it's valid to almost everybody, it's invalid but only as to the company. That's not an advancement appeal. No, and I won't argue against myself on that as to why that would be the case. But, I mean, I think the court found that there was, you know, a violation of the Defend Trade Secrets Act and of the Uniform Trade Secrets Act. So, just to be... Seems like Rule 65 would... is it 65d would kind of... even if you... maybe you couldn't actually restrain the entity, but you could... you're restraining anyone who's in concert or an agent of the restrained party. Is the... as a practical matter, everyone who needs to be... all the defendants could be restrained by virtue of that. I think that's a fair assessment, Judge. And the other argument would be, of course, that they've fled claims... I mean, the two claims that were the basis for the injunction are the Defend Trade Secrets and Uniform Trade Secrets Act cases, not the contract case, not the contract accounts. But to your... Now that we've taken up a bunch of time, why don't we get to your primary arguments. Yeah. And the point here is, as you all have seen from the briefs, the point is that these individuals, when they left, Mr. Winters and Ms. Atwood believe that the protocol applied and, indeed, they follow the protocol. And that's what the record supports. The protocol permits them to take client names, addresses, phone numbers... Assume, hypothetically, that that's all true. How do you get around the contractual provision that admits a little bit clunky, since it said there they weren't a party to it, but it says if they become one, you agree the contract shall take precedence. How do you get around that? Well, we get around that, Your Honor. That was this... Let me just say this. That was the substance of, as you've seen, what was briefed below. And our argument on that is that the protocol is a contract as between, in this case, S&L, Solomon & Ludwin, and 2,500 other firms, including Founders Grove. Those are the contracting parties to the protocol. The employment agreements are with Mr. Winters and Ms. Atwood. They are third-party beneficiaries of the protocol. So, if you're going to amend the protocol, if you're going to do that, and the arguments are set forth in the briefs below, you have to provide notice to the other contracting parties. The contracting parties, again, are these 2,500 other firms. So, you're saying you can't... Let's assume this was... The language in the agreement was a little bit different. It said, we're parties to the protocol, but let's be clear, we're not... In this contract, you agree that any protections, rights, provisions of the protocol do not apply to your employment. And you say, I'm in, and sign. You're saying that wouldn't be enforceable? It's not enforceable unless notice is provided to the 2,500 other firms. And we briefed this. Can I just ask you, I just find it... It strikes me that the District Court, if anything, erred by giving you too much of the benefit of the doubt, because it feels to me like your claims fail for, like, three reasons before the one the District Court got to. I don't understand how you can have a 2,500 party contract. That's one thing. I don't understand how you can have a contract that people can unilaterally join at will. I don't understand how a con... And I don't understand, candidly, how this... I mean, this is what I read to be the District Court's narrative. It's like, there is a narrative here that the District Court largely adopted that a bunch of scheming employees seeking to steal information from their former employer, on their way, went out the door and created a new entity, and then surreptitiously had that entity sign up for this protocol in the middle of the night so that they could then claim the benefits under this protocol that the stealing entity that the departing employees created signed in the middle of the night so they could then assert the benefits of the pro... It just seems weird that the departing employees can incorporate this entity on the way out the door, have that entity join the protocol, and then use that protocol to override the terms of their employment agreements. That seems bizarre to me. Let me address that in a couple of forms. Prior to... And this is on the... Prior to 2004, there were an incredible number of lawsuits that were consistently filed by financial services firms because investment advisors and brokers were leaving, they were taking clients, they were taking information. Things were out of control. There were two primary concerns here, or three. First of all, Reg SP, the control of information. So the firms got together, the big firms got together and said, we've got to control this in some way. Let's come up with an agreement among the financial services firms so that we can say what we believe can be taken, fairly be taken, that's not going to harm the customers. But at the same time, protect the customer's rights to do business with who they choose, whom they choose, and let's prevent all of these lawsuits. And you see it from the cases that are cited. These lawsuits all but dried up after 2004. There's some, and there's some dealing with the protocol, but by and large, they dried up. And the way they went about it, and I agree, Judge Heiden, it's a little different than what we've seen, but it's worked for 20 years. We have cut down on this litigation, and we've protected customer information. I mean, if the entity here was a pre-existing firm that was a pre-existing signatory of the protocol, I think a lot of what I just said wouldn't apply. But it just seems weird here that the very people whose conduct is alleged to violate the law themselves went out and created an entity, which they then manipulated to have join this protocol as quickly as humanly possible, can then assert that the entity that we ourselves just created gets to take advantage of this protocol that was really designed to protect, like, pre-existing brokerages that wanted to be able to hire new employees without ruinous liability. I would, I understand your concern, Judge, and let me reference you to one of the articles that the appellees cite to. It's from a guy named Michael Kitts, and Kitts says, this is his, these are his instructions. Breakaway brokers who are leaving their brokerage to go to an entirely independent, which is a very common phenomenon today, and form their own RIA, should have their new RIA join the protocol before they leave their existing firm, right? This is not an uncommon occurrence. We have gone, it's just like with community banks. How is that not, I mean, I just keep, how is that not a breach of their employment contracts? While I still work for company one, I'm gonna form company two and have company two sign this protocol. I don't understand how that's not a breach of your employment contract. Well, I think Virginia law speaks to this, Judge. Virginia law is very clear that the employee has the right to make arrangements during his employment to compete with the employer after resigning his post. There are a number of Virginia state court cases that say that, and we've cited the Kant Associates versus Adelaide case from the Eastern District of Virginia saying the same thing. Defendants' actions prior to resignations were at most arrangements in contemplation of future competition with their former firm, not active solicitation, and that's the distinction the courts draw, and that's what's missing here is some active solicitation beforehand, but what you can't prevent is someone from preparing to leave. Otherwise, you would be in a scenario where you resign from one firm and then you've got nowhere to go for weeks or months. The protocol doesn't work that way. The protocol is specific. You get to take five pieces of information. You then give, and this is what they did here, you give SNL six pieces of information, the same five plus account numbers, and then you leave with that information, and everyone competes for those clients. It's a level playing field. You compete for those clients. You can't solicit before, and you can't take more than that information, but everyone will compete for those clients, and if you don't like those... I understand that. I want to go back to what you said about you've got to give authority that would bind that, that has interpreted the protocol that says that must be done, and because we were... I know it happened late, but we were supplied with a district court case that talked about, hey, the contract takes precedence over this. Could you... Can I grab one thing from my book at this point? Sure, sure. You asked for authority, Judge, and let me be clear. I don't know that this issue is before the court right now because of what the district court decided this issue on rating, but I want to address your question. There is a process under the protocol for submitting a letter, and this is published. The company is called JS Health. It's a big consulting firm. They have the rights. They manage the protocol database, and what you do is you publish a letter that says... So in the case, interestingly, that they cite, the entity LPL, which is one of the big independent facilitators for RIAs, they file a document that says, yes, we're carving out a segment of our business, be it our bank segment or some other segment. So there's a specific process for carving that out. Because that issue is not before the court today, I don't have a case in front of me that says where the court's upheld that, but that's the process. And I believe those cases do exist where you say, okay, we want to carve out a specific line of business because they're getting all the referrals from the bank. So we're going to carve out that line of business. All you have to do is submit this to JS Health, and then the 2,500 firms are on notice. That's what wasn't done here. The other thing that wasn't done here is if there were concerns about the protocol... Back to Judge Hyten's question, that kind of makes sense. You're providing notice to a bunch of existing firms that they might be subject to liability or their employees might, or new employees might be subject to liability. That's different than people leaving, having agreed not to be bound by that. I mean, it seems like the agreements with your clients, they say we're going to let the contracts take precedence. Then they leave and they join and say, well, no, that now the protocol takes precedence. There was no problem that they had. They had no reason to think, did they, that the protocol would apply to them? I mean, they follow the process. They believe the protocol did apply to them. And I think your point is, Judge, if I may, that, well, it's not like they went to Wells Fargo and Wells Fargo needed to be on notice of this because this is their own firm. But that's the way this has been applied. I mean, and that's what the article they cite references. This is how this works. More and more because more and more folks are leaving and going on their own. But what it does mean is that everyone is on notice. If there is an exception, everyone's on notice. We could just as easily, and I don't think there's a distinction here, be talking about a scenario where they left and went to another pre-existing protocol firm. And in that instance, we'd be making the same argument, that they didn't provide notice to those entities. I don't think it changes the dynamic that this entity was created shortly before they left. I mean, that happens all the time. There are myriad of those. Thank you, Counsel. Good morning, Your Honors. Paul Werner on behalf of Solomon and Ludwin, SNL. I would like to begin by saying that we are committed to providing more preliminary relief to halt defendants' shock-and-awe campaign to steal SNL's clients by misappropriating their carefully guarded and valuable trade secrets. In putting in place a narrow ceasefire, the court identified and applied the correct law. It carefully assessed all of the evidence before it and weighed it appropriately. And it did not remotely abuse its discretion in simply stopping the defendants from poaching clients based on misappropriation   of trade secrets, while at the same time, leaving them free to go out and get their own clients, continue to serve the clients that they converted in their shock-and-awe campaign over a holiday weekend, and also left them free to serve clients who came from SNL on their own. What do you mean converted? How would they convert clients that they worked with at your firm until the expiration of the two-year period? You're right. They improperly did so. You said they could convert them. They can after two years. That's what you're suggesting. They can't. But not for two years. Yes, Your Honor. You'll recall that they performed this raid over a holiday weekend before the courts could draft it. I'm just trying to make sure I understand your argument. You made it sound like they could go about, let's assume they didn't do a holiday weekend. Let's assume they just left and started. They didn't have the right, under your whole theory of the case, to go to the clients that may have wanted to work with them after they left. I mean, that's why you're here, right? Absolutely correct, and that's what the district court found. The district court marched through all of the relevant inquiries, and I can proceed to explain. How does this ... I mean, I think there's an interesting question contractually when they have agreed that the contract takes precedence over the protocol. But to use the rating exception feels odd just reading that to me. I mean, first of all, it says against the new firm. It seems to suggest we're talking about a pre-existing firm. And if you think of the word rating, you think of an outsider coming in to take something from an existing entity. This doesn't feel at all like rating, either definitionally or even reading the contract the way it is. Well, okay, so you raise two different points, two different reasons why the broker protocol is not the get-out-of-jail-free card that the defendants claim that it is. First of all, you raise the contract point, and you asked about whether their authority is on point. There are authorities on point, and we cite them on brief, and we provided a supplemental authority last night. That's the Columbia River case and also the Midwestone case. Those are the only ... Remind me of the courts. What courts are ... One is the Southern District of Iowa, and the other is the Western District of Washington. District court cases. They are district court cases. Is there an appellate court case who's addressed that issue? No, Your Honor. There are no appellate court cases, and in fact, those are the only two cases at all that we're aware of that address this broker protocol issue where you have a collision between privately negotiated contracts and the interaction of the broker protocol, and both of those cases say exactly the same thing. The broker protocol is not an ironclad suicide pact. It operates in the background to accommodate otherwise individually negotiated and tailored private agreements, and that is what happened here, as you can see. On all of the agreements in Section 25, and that's at the JA at 56, these parties specifically contracted around the broker protocol. They're free to do that. The defendant's own expert, John May, testified during the preliminary injunction hearing that parties are free to do that, and that's at 911 of the JA, and he specifically testified there is nothing in the protocol that says that parties cannot qualify their membership in the protocol. That's exactly what the parties did here, and of course, the district court didn't reach that question because it found that the rating exception was also satisfied. So can I tell you what I think is to me conceptually the hardest question here? I think the district court's bottom line was absolutely defensible and almost certainly right, but I also think the reason the district court gave is probably at minimum is not the easiest reason and is arguably wrong. So what do I do? So the district court assumed for the sake of argument that the question was whether this violates the protocol and then says it does. But now what I hear you basically saying is they contracted around the  That's not what the district court said, though. The district court said, assuming the protocol applies, the protocol doesn't protect them. So just in the context of reviewing a preliminary injunction, can we, like, affirm on alternative grounds? Which I just conceptually find a hard question. Your Honor, the court could, but it doesn't need to. The standard here is a lenient one. It's abuse of discretion. The court Yeah, but by definition It's by definition an abuse of discretion to make a legal error. It is not a legal error, and I'll explain why. The court jumped over the contract interpretation question and resolved the preliminary injunction, the broker protocol question, on the evidence before it. It took evidence and considered the evidence on whether or not It has to first make a legal determination of what is rating. It has to interpret that language. And it either did it right or it did it wrong. It, you know, I think that's a hard argument. I've looked at dictionaries. I've looked at corpus linguistics. I've looked at a bunch of stuff, and it, you know, quite frankly, doesn't help you. Your Honor, the court considered the evidence on the definition of rating that was presented to it by experts and also reviewed law review articles. Fair, fair. But the way that works, I mean, the interpret, don't you agree that the interpretation of rating is a legal decision by the court? No, Your Honor. I believe it's a factual determination. There is no consensus, legally or factually, around What's the authority? It's the interpretation of the meaning of a document, of an agreement. You're saying that's a factual question? Based on the party's intention around it, and again, this is not a typical contract. It's hard to say that it's even a contract. It is an industry default. So if this is a contract, which law governs this 2,500-party contract? What law would govern this? There isn't any identified. I live in a post-eerie world. There has to be some law. If this is a contract, it's governed by the law of somewhere. What law is it governed by? It doesn't specify, and I don't know. It doesn't specify. As you say, it operates nationwide. It would apply to thousands upon thousands of different parties, which is one reason why the court assumed, even if it were to apply, can it actually operate here, where the defendants engage in raiding activity? So is your point that raiding is an ambiguous term, and the court needed to take evidence to figure out what that term means? Yes. No undisputed or unambiguous legal definition? Absolutely, Your Honor. And the evidence bore that out. The article that the court relied on pointed out that there is no industry consensus. There is no legal consensus. The definition is nobody knows what the definition is. It's like obscenity. You know it when you see it. It feels like 40% of something. What it is is a severe economic impact and predatory or improper conduct, and the court found both of those core elements were met here. In terms of a severe economic impact, the district court found that the defendants converted 400 accounts, 100 households, and over $300 million in asset value, and it also found that the defendants engaged in predation. So that's an interesting question. I mean, I think you're right. Judge Rushing's question to you presents a way a district court could look at an agreement and could say it's ambiguous, and then you do take extrinsic evidence to determine the ambiguity, the intent of the parties and things like that, but isn't the determination over whether a provision is ambiguous or not a legal determination? It is to some extent. Under what state's law? Again, I don't even know how I answered that. I don't think anyone here can answer that. Nobody knows. Well, no, but I'm just saying the rule that says a contract interpretation is a question for the court unless it's ambiguous, in which case you take evidence, I agree that is, as a descriptive matter, the law of many, if not most states, but if that's the rule, it's because it's a rule of a given state's contract law. And, Your Honor, I think that further supports the wisdom of the route the district court took by evaluating the evidence. Oh, I wouldn't say that. It might complicate it and say, look, there's a more direct way to have done this, which is the parties agreed that the contract takes precedence over the protocol, but Judge Hyten raises an interesting question. We're in a preliminary injunction. Hypothetically, assume it was wrong. I know you don't think it was wrong to have done that. Hypothetically, it's wrong. There may be a right way. What do we do in that situation? I think the standard controls, the standard here that the court is to apply is abuse of discretion. And the court did not abuse of discretion. No, no, no, that's, I mean, my hypothetical is that the court was wrong in saying the rating provision applies. Well, the court, yes, Your Honor. You're going to fight me on that. Obviously, I'm just hypothetically saying if that is the case, but you have an alternative ground, can we affirm a preliminary injunction on a ground that wasn't even addressed when probably the primary issue in an injunction is likelihood of success on the merits? Yes, the court can. Because as you know, the core question, the core legal issue is whether there is a likelihood of success or not. And here, the court did correctly find that there is a likelihood of success because the broker protocol, whether it didn't apply because the parties contract around it or didn't apply because the defendants met an exception to it, did not bar enforcement of the confidentiality obligations and the non-solicitation obligations that the parties had agreed to. And therefore, plaintiffs are likely to succeed on their Defend Trade Seeker Act claims and their Virginia counterpart. So can I bring you to prong two of the PI analysis? If you view taking clients as irreparable harm, why would you enter into a protocol that lets people take some client information? Well, one, the parties didn't enter into that protocol here. They contracted around it. I think there's no dispute that your client signed this. If your client believed taking client information is irreparable harm, I don't know why your client signs a protocol that lets people sometimes take client information. Well, here, Your Honor, the district court found a range of irreparable harms. And the parties didn't comply with the protocol. They fell into an exception of it. And the irreparable harm flowed from the rating activities. They took and converted substantial assets. They took substantial clients. They caused harm to their customer, to their goodwill and reputation in the wealth advisory industry. And importantly, they stole trade secrets. Those were all of the irreparable harms  Wait, what were the trade secrets they stole? The client information. No, but I thought the protocol lets them take the client information. The protocol could. As long as they don't engage in rating, the protocol pretty clearly says they can take client information. It does, if it were applicable here and they didn't engage in rating. No, no, no. But it doesn't say if you do rating, then taking the information was invalid. It says you can take the information as long as you don't use the information to engage in rating. And that would seem, if you engage in rating, the remedy is you will be sanctioned for engaging in rating, but then we will retrospectively say taking the information was itself a violation. That seems like a bizarre way to read the protocol. No, I think that is the way to read the protocol because the protocol doesn't apply if the defendants engage in rating. They're outside of the protocol. And that's in fact what the defendants' own expert testified to. That's the JA-912, where if the exception is met, then the protocol isn't operative. But the way that works, I mean, you know, it's got a 40% impact. But what if it's just one person and they leave? And, you know, that one person goes into business by him or herself and it's someone with a whole bunch of clients and they call on their clients and they go with them. I mean, that's rating? That may be a harder case, but that's not this case. Why is it harder? Because it's one versus four? No, it doesn't. The evidence-backed definition of rating involves a substantial amount of production. If that one person qualifies as a substantial amount of the business production, then the rating exemption can apply. But that's not this case. Here, half of the customer-facing staff, advisors, and operations professionals left. And they took nearly half of the client asset value with them. Sure, sure. I get the harm and I get why you have an agreement and they signed an agreement. And, you know, it's kind of that's the end of it except for we have this protocol and we got to decide, you know, does it apply or not? We have a whole issue, contractually, about whether it applies. But if it applies, you're trying, you know, there's this, they are allowed to do this unless they raid. And it says the new firm, you know, shall not raid. And I'm just, this feels like, you know, that language to me, I think, could suggest an outsider coming in and taking clients of an entity as opposed to someone leaving. Your Honor, I think ultimately these are fact questions that the district court is in the best position to evaluate. In terms of the new firm issue, the defendants are the new firm. They are the new firm. The new firm acts through its agents. Its agents are the departing employees here. They are the employees who were duty bound to maintain the secrecy of the trade secrets. They were duty bound not to misuse those trade secrets. And they did so to benefit their new firm. Again, that they set up in the dark of night and signed the protocol immediately to launch a mass solicitation campaign. That was devastating and it's a fact. And that's why the district court halted it while the merits can be sorted out. Your Honor, if there are no further questions, we would ask that this court affirm the district court. Thank you. Thank you, counsel. If I could address Judge Hyten's question or two questions, I think. First of all, what law applies? I would certainly argue that the law of Virginia applies. The last act necessary to effectuate both S&L's participation in the contract as well as Founders Grove was where they executed the agreements. They're Virginia companies. They executed in Virginia and I believe the law of Virginia would apply. We're talking about I think the question was the protocol. Is your answer with respect to the protocol? With respect to the protocol. That they would have executed because there's a document that they execute and they would have executed that document, I believe, in Virginia. There's not evidence on that. Let me go back real quick. The other question that Judge Hyten's raised. What if it's the right result but the wrong reason? I respectfully disagree. But if that were the case, we're briefing a question of rating. For better or for worse, the district court decided not to address this underlying issue of whether or not you can unilaterally modify an agreement a year before     between S&L and these firms through an agreement with third parties.  with these employees. The district court chose not to decide that and instead found that there was this rating exception that we've been talking about and I'll get to it in more detail. That's what we're here on. That's what has been briefed. For a preliminary injunction, the question,  is likelihood of success on the merits of the allegations and the complaint. Right? So we don't have to find a likelihood of success on the rating  exception to find that the plaintiffs are likely to succeed on the merits of their trade secret claims and contract claims, et cetera, et cetera. Well, I agree, Judge. I think it's a little tricky because in order to find success on the merits, you have to find that for us that the protocol likely would have applied. Well, what the district court did is it said, we're going to, for purposes of this decision, make sure I quote it correctly, we're going to, because of this rating exception, because of this finding, meaning about rating, it's unnecessary for the court to determine whether defendants' agreements override the protocol or whether the team agreement exception applies. So in essence, the district court said, okay, I'm going to assume the protocol applies and here's why it doesn't work here because I'm going to find that there has been rating. Yeah, but those are legal questions, right? Like whether the contract overrides the protocol. We can decide those, whether they're likely to succeed on those just as well as the district court could. I think that the court can, but my concern is that we're here on an appeal, obviously, of this issue and the district court sort of removes that issue. True. We hear, yeah, that that's not really what the decision was or the briefing was, all that sort of stuff, but that happens all the time. I mean, we don't have to do that, but we can do that. And the question is, is a preliminary injunction, I think some exception to that rule. I think Judge Rushing's question suggests why can't we do it. Well, I would say this. As the counsel for the appellants, I wish the court would, right? Because this decision was made in July. We're here in May and we're talking about rating when I think it's pretty clear to this court that questionable whether there could be rating under the facts presented in the first place, but there certainly is no rating exception as the district court interpreted it. So I would rather be talking about the merits of whether or not you can modify this agreement through the employment agreements. And if this court determines that it can, I assert that we're correct. And I'd love an opportunity to respond to their supplemental submission on that point because, again, that case, another example... You've got a minute and we're not going to be strict, but you ought to do it. Yeah. So they found two cases that they think support them. The last one is the Southern District of Iowa. And I would assert that's sort of, to Judge Heighten's point earlier, right result, wrong reason. Because in that case, what the court did not elaborate on... And, again, I'm talking outside the record because I'm dealing with the case I got at 4 o'clock yesterday. But in that case, LPL, as I said earlier, had specifically provided notice to those member firms. So the court's analysis, I think, was flawed. I also think there were a number of distinctions in that case, not the least of which is it involved the sale of a business as opposed to a normal employment context, which we have here. It also involved a situation where there were accusations of solicitation prior to the departure. But most fundamentally, it would have been appropriate to amend the protocol there because LPL had provided that carve-out, that notice, to the 2,500 members of the protocol. That's what we don't have here. You cannot, under Virginia law, and this is what we've briefed below, you cannot amend an agreement between parties, between SNL and the 2,500 members by agreeing to something with third-party beneficiaries of that agreement. I don't think there's any support in the law for that. Unless the court has any other questions. Thank you. Thank you. We'll come down and greet counsel. And we'll move on to our last case after that.
judges: A. Marvin Quattlebaum Jr., Allison J. Rushing, Toby J. Heytens